Start the clock again on Case 14-1779, Merck & Company v. Gnosis, and Mr. Parker. Thank you, Your Honor, and for the record, my name is Tom Parker, representing the appellant, Merck & Cie. Your Honor, the situation here in terms of the teaching away, in terms of the board, the issues with respect to the references and the board's handling of those references are essentially the same with respect to Horn and also with respect to Harper. What's different about this case? I mean, I think we have your argument on those issues. What's different that we have to decide about this case that isn't resolved by the arguments in that case? Anticipation, the issue of anticipation, and let me just get to that. So let's – can I ask you this because you also have a claim construction argument here too. Yes, that's correct. Does a claim construction argument matter if we disagree with you on obviousness? Because it didn't seem to me like you argued that in your brief here. No, no, and Your Honor – So even if we agree that the claim construction may be faulty for including both forms and that might affect the anticipation question, if we conclude that the board's obviousness determination that Serpentine and Meraza are sufficient, does the claim construction affect that combination? The answer is no, Your Honor, and this is the reasons why. Because it's still our position, despite the construction of the claim, whether you affirm or overturn the board's construction, the position with respect to obviousness is still the same, that the prior art teaches against combining Serpentine and Meraza. But that's not true of the anticipation issue, is it? With respect to the anticipation issue, that is correct. The board's construction – no, no, let me back up because I want to just lay this out. One of the main arguments we have is that the Serpentine reference, just standing alone, is not a proper anticipatory reference. So if you were to read Serpentine the way in which the board interpreted Serpentine – It's a question of fact. On Serpentine? Yeah. It might – there's no – Anticipation is a question of fact. Right, factual findings, exactly, substantial evidence. It's more than what the prior art means is a question of fact. That's right. Okay. Okay. So if you adopt the board's reading of Serpentine – In which case the claim construction doesn't matter to the anticipation outcome, does it? If you adopt our interpretation of Serpentine, if you agree with our interpretation of Serpentine, then the board's claim construction would not matter. If I can, I can explain. Yeah. Okay. Serpentine, the whole thing boiled down to the phrase suitable active metabolite of folate, SMOF. Now, the board explained in its opinion why it felt that SMOF was limited to a series of eight individual compounds, or at least that's what one of the board members coming out would have thought of, based upon a declaration submitted by their expert, Dr. Miller. But on his deposition, at his deposition, he testified in essence that the term SMOF did not include those eight single individual compounds which were in the free acid form. He testified quite clearly that it covers all variations, all the salt forms, perhaps crystalline forms, polyglutamate forms, whatever. But it did not – it included so – the class was so large, thousands of compounds. In fact, he testified that you'd have to conduct experimentation to determine which ones would be proper for any particular route of administration because he also testified that Serpentine, the word SMOF, encompasses an appropriate compound, for example, for use in a suppository, for use in a lotion, or a transdermal patch. So this is how broad Serpentine is. And I think it's not a question of – there is no substantial evidence supporting the board's interpretation that on the one hand you have Dr. Miller testifying that the reference covers thousands of compounds. And in fact, in the companion case we laid out in our brief where the board summarized Dr. Miller's testimony, which would show the size, the breadth of what's being included in that term. It's not defined at all in the specification. This is not an in-ray petering situation. This is one term in Serpentine, not defined at all. There are no preferences at all explained or identified. In fact, the only identifiable compound by name is folic acid. So we would say that the reference by itself is too broad to be an anticipatory reference because one of ordinary skill in the act could not envisage immediately all these compounds at once, especially when you have to do experimentation, especially when there requires all these routes of administration. And the problem is when you have an expert who provides contradicting testimony versus a declaration, that can't be substantial evidence. So our expert agreed in terms of the scope, and our expert's testimony is consistent with the scope of Serpentine as Dr. Miller testified under oath during his deposition. They don't challenge his deposition in terms of what he said. They don't. And the board, though, just stuck with that declaration and ignored the deposition testimony. So in that respect, Your Honors, then Serpentine would not be an anticipatory reference because it's more like an Eli Lilly case or an impacts case as opposed to in-ray petering where you actually have specific compounds identified as their preferences. And there's in-ray Schwab as well. So the claim construction. Now, on the issue of claim construction, the board construed the phrase, it's 5-methyl-6-tetrahydrochloric acid, which is recited in the claim. And if I may like to refer to it as L5, it's just a lot easier. They construed that claim. We took the position that a proper construction of that claim term would be just the isomer itself, and that's it. And they agreed that that claim term on its own is directed to the natural isomer, not the unnatural isomer. Where the disagreement comes is with the word comprising. Does the word comprising open up the claim so much so that the amount of unnatural isomer can be within the scope of the claim to the point where you could have a 99% of the unnatural isomer and 1% of the natural isomer when, in fact, the claim limitation specifically recites the natural isomer? And our position is no, and I think this is more of a legal question. Because claim construction, the board didn't adopt, the board basically premised it on their review of the claim language and the specification. They rejected Dr. Gregory's opinions with the claim construction. I mean, if that were to be reviewed, it would be reviewed for clear error. But in this particular case, the board did its own, you know, it relied on, and it made no underlying factual findings or subsidiary findings of fact. And then we mentioned a fair amount of case learning. There are really two things with the word comprising. I think you have to ask two questions. Does it negate a particular limitation if you use the word comprising and you make it so open-ended? Okay, does it negate it? And then does that construction reasonably reflect what's actually being disclosed and being described in the specification? And if you look at the board's construction, the answer is going to be no. Because if you adopt the board's construction, you can get two types of situations. One where you can have equal amounts of the natural and unnatural ICMR. Well, that's considered to be a totally different concept. That's the receiving. And you would essentially vitiate the element reciting the actual ICMR itself individually. And another situation you can have is where you have so much of the unnatural ICMR and a very little amount of natural ICMR, 0.1%, then the unnatural ICMR is doing all the work, if it's doing any work at all. Why is that a claim construction issue? Why isn't that more better left to an infringement question? It may be that the claim comprises, because you used the word comprises, includes both, but that if it really is 99% of the unnatural one, it doesn't infringe because the claim really is about the natural one. That's an excellent, that's a great question. And in some respects, I would agree. But I think since the way the board wrote their decision, now we're stuck with this comprising, almost as if it's a legal conclusion that the comprising is open-ended and it just opens up the floodgates to the natural ICMR. And just let me reflect a little bit on the specification itself. The whole invention is about utilizing natural… Is it your, I mean, this is stuff I have a hard time with, but is it your view, I think, that if the board views a comprising in this sense, with particularly kind of drug patents or pharmaceutical whatever's here, that it doesn't limit it to anything? Like every kind of possible ingredient could be included if the board's interpretation of comprising stands? No, no. In this particular case, the word comprising would be, if I'm answering your question correctly, would be just with respect to the unnatural ICMR. Other components, of course, can be added. Did I? That's okay. Okay. Go ahead. No. I mean, just to reflect on the specification that the issue, I mean, the description there is to use a natural ICMR to influence levels of homocysteine. Each and every embodiment, there are ten examples, for example, each and every one utilizes a very specific natural ICMR. And they call it out by name, by name, by structure, not its three-dimensional structure, but they call it out. And also in the patent in column one, they also describe racemic 5-methyl. So it would indicate that certainly the inventors knew how to describe, if they wanted their claim to include 5-methyl, what to say and how to do it. So the cases that we cite that I think are instructive are in our briefs and which really exemplify situations where the word comprising is in place. And then when the word comprising was construed to be open-ended, it ended up being overturned because it negated a limitation or did not reasonably reflect the plain language and disclosure of the patent. So that's the basis on the claim construction issue. One other item that's not common to the other cases, this whole notion that we have a set of claims in the O4O patent that are directed to levels of homocysteine rising due to genetic deficiency, which is the methyl tetrahydrofolate reductase deficiency. And there the board rejected those claims as obvious in light of serfentine, miraza, and the reference eubic. Now, they never even challenged our position in their reply brief, and they didn't provide any expert testimony to our expert who described exactly why one of their skill in the art. I think it's important here, too, because I mentioned the experts because it is how else are you going to be able to get in situations like this to be able to perceive the prior art as a whole from the vantage point from one of ordinary skill. It certainly can't come from the attorneys. I understand sometimes references say what they say, but the expert will have that body of knowledge in his mind when he's reviewing the references and certainly can apply what one of ordinary skill would have thought of when reviewing a particular reference. In eubic, for example, eubic associates the genetic deficiencies in the claims in the O4O patent, and it teaches that you can use folic acid to lower the homocysteine. I didn't follow your argument about the expert. What were you trying to say about the significance of the expert? Well, in this case, this is a complex technology. We put forth a fair amount of expert testimony in various respects, and none of it was rebutted by any counter-expert testimony on the paranosis. And I think in a situation like that, what you miss out is what you have as attorney argument as opposed to something based upon an expert opinion. But the finder of fact is always free to discount the weight. It's a matter of weight, isn't it? That's right. How much weight to give? But what the board cannot do is substitute for evidence simply attorney argument or its own expertise. But that's the particular case here that we have in situations here. Let me give you an example of eubic. Your point. Excuse me? Eubic. Eubic basically teaches the use of folic acid to lower the homocysteine. And serpentine also teaches the use of folic acid as well to lower homocysteine. But nowhere in the board's decision – I mean there's nothing in the board's decision to motivate or suggest to the person of ordinary skill in the art, as our expert described, why someone would make the substitution from folic acid to the reduced folate. Folic acid was working fine in eubic and it's also even disclosed in serpentine. So what's the reason to make the switch? There's no problem to be solved in that particular case. And so we would submit that the claims were not obvious in light of these three particular references. And so that's one of the differences between the two cases. Again, we provided a substantial amount of evidence in response to that. Your Honors, I may stop here. Okay. We'll save you some rebuttal time. Let's hear from Mr. Swick. For the record, good morning, Your Honors. Joe Swick on behalf of the Pele's Gnosis. Regarding claim construction, I think, as Your Honors correctly noted, that if this court finds that the obviousness analysis was correct with respect to this patent as well, then we need not go into the anticipation issues or even the claim construction issues. That being said, I do want to address the claim construction issues because I think they were correctly decided. The first point I want to make is that the board did recognize that the claims in the 04 patent were a comprising patent claim. And this court in Dipping Dots v. Mosey said that when the word comprising is used, that raises a presumption that the list of elements is non-exclusive. So is it a bright line 100% test? No, I'm not going to say that it is, but it does give us the presumption that the claims are not limited to only the elements that are stated right there. The second point I want to make is if you look at the specification for the 04 patent or the claims of the 04 patent, you won't see any of the words that they're asking be imported into claims, which is substantially free of the non-natural isomer. So there's no express language supporting their claim construction. And another point I want to make is that we've got to consider the standard that the board was using that counsel did not talk about. The board, of course, has a standard of that it is looking for the broadest reasonable construction of the claims. And I submit that what Merck is talking about here is the narrowest possible construction of the claims. To the extent there's any ambiguity whether the non-natural isomer should be included or not, that should tip in our favor given the construction standard that the board was required to apply. To the extent they've raised these issues of, well, the board's construction means that you can only have 1% of the 6S5MTHF. Well, they never made those arguments. That's not the construction they asked for the board to make. They asked for the board to completely exclude the amount of the non-natural isomer. So for them to be arguing in the briefs here that, well, the board is making a finding that the claim encompasses administering any amount of 0% to 99% of the non-natural isomer. I think it's a straw man argument because they're saying, well, the board ruled this way. Well, the board was never asked to rule on what 0%, 1%, 2%, what would be appropriate in this case. The board was given a specific question. Does it exclude the non-natural isomer? And they made that decision. The fact that a non-natural isomer example is not in the specification, in my mind, is not persuasive. If we look at the Inovay, sure. Isn't it true the record says the unnatural isomer is inactive so that to interpret a claim to be ineffective, is that reasonable? It is, Your Honor, because there were, at that period of time, racemic mixtures. There was the 5MTHF racemic mixture that included the natural isomer. Racemic is different. That's 50-50. Correct. That's not the 1%. That's not 1%, correct. So, in my mind, there was an understanding that mixtures were possible. And we saw that Meraz was trying to separate the good 6R isomer from the bad. I mean, from the good 6S isomer from the bad 6R isomer. So, there was the prevalent knowledge that there were mixtures out there and that what was important was getting the 6S5MTHF into the claims. But the fact that other ingredients such as non-natural isomer may come in was understood at the time based on the racemic mixtures being out there. That was understood as a possibility. You know, another thing I think is important on this substantially chirally pure, or the fact that the claims should not be read to include the non-natural isomer, is that if we look at the Bailey patents, they do have that language. They do have the language that the claims are limited to the substantially chirally pure 6S5MTHF. So, that shows that Merck could have claimed it that way but chose not to do so. Regarding the anticipation arguments where they said that the suitable active metabolite of folate is an unlimited number of compounds. And, I mean, I disagree that our expert conceded that. What our expert did say in his declaration, that is that the natural reduced folates are limited to 8 compounds. He didn't say that by himself. He cited to the Modern Nutrition textbook. He also cited to the IUPAC nomenclature materials which supported his opinion that the reduced folates in the metabolite cycle are limited to 8. And we went through this issue at oral argument at the board. And, you know, I understood counsel at the board to concede that it was limited to these 8 natural reduced folates. Because here we have on page A1175 of the record. This is the oral argument. Judge Camelt at the board said, is L5 an active metabolite of folate? Mr. Parker said, L5 methyl polyglutamate is biologically active in the system. It's an active metabolite of folate, yes. Judge Camelt said, what else is? Mr. Parker said, what else is? Yes. Can you list them? All the various metabolites of folic acid when it's going through the cycle? Judge Camelt, yes. Well, they're the ones that were listed in the reference that petitioners identified. They are part of the cycle. Judge Camelt, if you had a diagram of the cycle in front of you, could you read off to me the active metabolites? Mr. Parker, yes. They would be showing the metabolite, yes. Judge Camelt said, about how many? Mr. Parker said, well, there's at least 8 or 9. Judge Bonilla says, are there any more than what's listed by the petitioner? Mr. Parker, are there any additional ones? Not that I am aware of, no. There may be THF, maybe one. I'm not sure if that's included. I don't know. So for, you know, if we're looking at serpentine and the board's reading of the meaning of serpentine, we see that they have concluded, and there's substantial evidence to support their conclusion, that the But where was the substantial evidence leading to the selection of the L5 from those 8 or 9? The substantial evidence is that the language in MARAZA is calling out as L5 MTHF as a promising, suitable active metabolite to be used as an active metabolite in vitamin therapy. We have MARAZA saying that. We have other references. You know, we saw McGoffrey, the Reggie, the Patini. All these other references are using 5 MTHF. There's universal recognition that the 6S isomer within the 5 MTHF. And how about the references leading away? Your position is we ignore those? My, no. My, I would never ask the court to ignore anything. My position is that the teaching away references are very weak. They're inconclusive. They're unsupported in the context of all the other references. If you look at the totality of the circumstances and all the other references and pointing towards the use of this as a vitamin, as an active metabolite to lower homocysteine, that it's a balancing. And the board was faced with that same issue. They looked at the teaching away references, and they looked at all the references we presented as showing it's not taught away. If it was really taught away, why do we have people actually using this in real life experimental trials? Why are they giving this to bicycle riders in the Alps to see and address their folate deficiencies? If everybody believed that this was a teaching away, why do we have so many people? We don't have to guess whether people would think conceptually, would this work or would this not work, or should I use this or should I not use this? We don't have to go to that conception question. People were actually using it. So for them to say it's teaching away and everybody else was wrong, well, they may have been using it, but they were wrong. Well, they were using it. If the other metabolites or some of them are just as effective, why wouldn't your client just use something other than L5? Our client, what the prior art also says, and Miraza says this too, is the L5-MTHF was known as to be the predominant folate in the folate metabolite cycle. So it was recognized scientifically as the predominant reduced folate in the folate cycle. So if I'm looking for which of the folates, which of the eights to use, I mean, I read Miraza and I say, wow, he's saying it's the predominant one. But until these scientists found a particular benefit and combination, people were just using folic acid. People were using folic acid, and I think the record is clear that the folic acid was a much cheaper alternative. But what the prior art also talked about is folic acid had its limitations. Folic acid is a chemically made product. Not everybody can absorb the folic acid, and the patent specification talks about this itself. Not everybody can absorb the folic acid equally. It has to be broken down into the reduced folates. So the idea was, well, why don't we use the natural reduced folate, the 5-MTHF, which, by the way, exists in leafy greens like spinach and things like that. Why are we making the body go through the metabolization process of folic acid? The idea was, and it was understood. That's exactly what I'm thinking about. If it was so clear, after all of these decades, particularly in pregnancy and the serious consequences of folate deficiency, until these scientists came along with this formulation and this focus, there were extremely serious consequences of deficiencies. Right, right. And the challenge that people were facing... If it was so obvious, what took so long? This is really what I wonder about. Right, right. Great question. And what we saw and what they recognized in Harpy is the stability of the L5-MTHF had not been optimized. There were concerns about the stability of L5-MTHF, and that's part of their teaching. Now, we do know, through the Godfrey and the Reggie, that they had found a product that was therapeutically stable enough to treat. Had it become commercially successful? No. They had not figured out the optimization of the stability until after these patents issued. I had a diagram in my briefs, and what we saw in the Bailey patents, the 915 was issued in 1999. And then in 2002, Merck itself gets the 168 patent, where they claim in the 168 patent, aha, we have now optimally stabilized the L5-MTHF. And that's in 2002. And then two years later, the Pam-Lab products come on, and then the products they claim take off. So what we see is we see a point where, well, there were some concerns about stability. Folic acid is stabler, absolutely, than L5-MTHF, but the L5-MTHF was figured and was shown to be stable enough to treat, and that's the standard. The standard should not be was the L5-MTHF stable enough for widespread commercial success in order to be obvious. It only has to be shown that it was therapeutically effective and obvious to be therapeutically effective. Mr. Quick, let me take you back to a question that Judge Newman asked, which I thought was a very perceptive one. Let's assume we have two prior art references that teach away from the proposition that we're interested in, and we have two prior art references that teach toward the proposition we're interested in. And the question we have to address is, is there substantial evidence in the record to support the proposition? How do you understand an appellate court's determination of what is substantial evidence in the record? My understanding of the standard, at least, is substantial evidence is evidence that a reasonable person could believe to arrive at that conclusion. Would we subtract prior arts one and two from prior arts three and four and say zero, no evidence? Or would we be able to say, well, there's prior art going this way and there's prior art going that way, and a reasonable person could believe one or the other? How do we do that? That was the question she put to you. I'm not sure I fully understood your answer. Okay, thank you. We did have some language in our briefs talking what the reasonable, the substantial evidence standard means. But my understanding is, essentially, yes, if a reasonable mind could have come to our conclusion at the board, then that should be upheld. If the board, you know, if it's also a reasonable conclusion, the positions that they're making, well, then that's for the board to weigh. That's the job of the fact finder to weigh references one and two against references three and four. They make their decision. I understand the job of this court is to look at that and say, well, was that a reasonable decision based on the record that we've seen so far that they picked references one and two as being stronger, more persuasive than the references in three and four? How about if we disagree with them? If you disagree that there are – We would have picked the other two. Then I think, again, if you disagree that it was unreasonable – No, I didn't say that. We just would have picked the other two. Then I think you have to affirm the board's decision. My understanding is as long as the board's decision is a reasonable decision to make, regardless of whether you sitting in their chair would have decided the same way, the decision has to be affirmed. That's a fact-finding question, and that's really the standard of review that we're talking about here. Substantial evidence is what a reasonable mind would accept in view of the entirety of the evidence. What a reasonable mind could accept. What a reasonable mind could accept. Because then we're taking our – Well, I don't want to quibble, but you have raised the question perhaps it's a diversion, but on the substantial evidence standard, which certainly is not a clear and convincing standard, Merck can then go back and sue in the district court on the established standard of infringement, and the result on the premise of an exact wash between the evidence on each side can't be therefore clear and convincing evidence on one side or the other. So where are we after all this? Well, where we are, Your Honor, is – I mean, I understand today we're only looking at what the standards are that the board applied and what deference we have to give that. Where we're going in the future, I'm not sure where we're going in the future. I mean, the Texas case that they filed is still stayed, so we'll see what happens. I've got to believe that the board's decisions are going to be very persuasive to the extent there's two other patents in this Bailey family that are still out there that in my mind are the same, if not substantively identical to what we're talking about. Where are we going? I mean, that's going to be fleshed out. I can't forcibly tell where we're going. I think a lot of it depends on what they want to do with it. So... Okay. Anything else you need to tell us? I think that's it, Your Honor. Thank you. Okay. Mr. Parker, you have a bit of time. Thank you, Your Honor. Just quickly, with respect to this whole issue of stability, I just want to point out that, you know, on the one hand, NOSIS has taken two positions. You know, they were saying that as far as the reduced folate, whether it be 5-methyl or L5, it was sufficiently stable for obvious purposes, but it was not stable when it came time to looking at the evidence with respect to secondary considerations. And in fact, the contradiction I can just cite in their own briefs are located at pages 43 to 45. This is where they say that the stability concerns were not resolved until 2002. And then in their briefs at pages 28 to 27, they made clear that their stability issues were resolved in 1991. And the Board adopted these conflicting positions. And also, with respect to the BRI standard, this Court's clarification that BRI does apply to IPRs would not have an impact on our position with respect to claim construction because BRI does not change the principles of construing claims to negate limitations or construing claims that just don't reasonably reflect the invention as it's described and disclosed in the patent specification. As far as the issue of claim construction, we offered a construction before the Board, but the Board went ahead and came up with its own construction for its own reasons, and that's what we responded to. So there is a difference of what was said down below in terms of what was going on here because they adopted something on their own, and so we had to respond appropriately. And then with respect to these slur references that are used in 5-methyl that counsel keeps indicating, the main issue here is would a person of ordinary skill and the art have a reasonable expectation that when you administer L5 for purposes of treating, let's say, for example, vascular disease, will that person have an expectation of lowering that person's level of homocysteine as a result of treating their vascular disease? And the reason why I raise that is because these papers that he's talking about don't deal with that issue. They talk about depression, they talk about schizophrenia, they talk about other psychological conditions, but that issue is not resolved in those papers. Well, you're touching on a very interesting underlying problem that's been troubling me and that you and I talked about and that Judge Newman has now talked about with Mr. Quick. Do you disagree with Mr. Quick's explanation of how we should go about figuring out whether there's substantial evidence in the record? That is, if we had two prior arts going this way and two prior arts going that way, we wouldn't necessarily say they neutralize each other. We would look at them and then we would ask the question, could a reasonable person have arrived at the conclusion that the board arrived at even if we thought an equally reasonable conclusion would have been the opposite had we been doing it in the first place? That seemed to be his view. Do you go along with that? No, I think you would have to look at the strength of the suggestion that's made in the references individually. In other words, if it's a strong compelling... We would re-weigh the evidence. What we're saying is you would look at a reference. For example, in Institute of Pasteur, the board's decision was reversed for a couple of other reasons, but one of them included for ignoring or misapprehending a prior art reference. Ignoring or misapprehending a prior art reference is a different thing. I don't want to push this too far, but you harped on Harpy, so let me harp back on the issue of Harpy. There was a time, back in time, you probably don't go back that far, but I do, when our view of factual evidence coming out of the USPTO was whether there was clear error or not. So back in the good old days, we might have looked at Harpy and said, you guys got that wrong. That's clear error. And so we're going to reverse the whole thing and send it back and now start over. Along in 1999, I think it was, the Supreme Court stuck its finger in our eye in the Zerko case and said, that's not the way it works. That's okay court to court, but that's not okay agency to court. And now you guys got to shape up and follow Section 706 of the APA. Even those of us who are old administrative lawyers sitting on the court thought clear error was okay. We were wrong. We now can't do clear error on facts coming out of the USPTO. The only thing we can do now is, is there substantial evidence in the record? What troubles me about this whole discussion today was there are four patents involved. Each one of those went through a determination by a three-judge board to determine whether to institute a review. And in each case, a board of the PTO, PTAB, determined it was more likely than not that they were invalid. It then went before four panel discussions and reviews in which you all put in all this testimony and all this fact and everything else. And there's multiple prior art. And as has become clear, there's also multiple complications in this. You're now coming up here and asking us to determine that there's no substantial evidence in the record to support any of this. But you then want to make a legal issue out of it, which is sort of hard to do when you're really talking about basically factual questions of what the prior art meant, what it interpreted, what it stood for, and how to weigh it. And I'm having a lot of problem. We're in a whole new world. The AIA is not simply more of the old days. The AIA, as Judge Newman pointed out, where are we? That's a very good question. We don't know where we are. And we're first getting into this. This is among the early AIA cases. And we really don't know what to do with these. And I'm puzzled as to how I'm supposed to go about deciding what you want us to decide when I think what we need to decide is, is there substantial evidence in this enormous record to support what these four merits panels decided and three institute panels all agreed on by all these administrative judges? What are we to do? Well, I mean, I share your pain because we're all going through this process, in some respects, this new IPR process. And so we're getting, we're slugging through it. But with respect to the references, I think there are situations where the panel can look at a reference and see what the boards that are characterized and say, well, no, this is not what the reference says. In fact, it says the opposite. And I think that would be a situation where you could find, there's no substantial evidence supporting the board's reading or interpretation of the particular reference. And that would be in view of the evidence. But any one reference isn't going to decide. In the old days, a bad reference might have sent the whole thing back. But we can't do that anymore, can we? I mean, I know. And a misunderstood reference doesn't get a reversal anymore because there may be, as Judge Hughes pointed out, even if your favorite Harpy case is wrong, doesn't matter if there are other prior art references that provide the board with substantial evidence. Right. We're going to have to figure it out. I'm not sure we can solve it this morning. Okay. Can I just have one more point? I'll do it. Go ahead. Okay. But there are the checks and balances, and that's the whole point of the appellate process, just to ensure that we're getting consistency in terms of the obligations of the board or whether it be the court. Just quickly, with respect to the claim construction, the BRI doesn't apply. Right. And as far as referring to me as conceding that the pseudoactive metabolite of folate, that phrase used in serpentine, that it only was directed to eight single compounds, that was not the nature of the discussion. It was simply, it has been known in biochemistry, when you ingest folic acid, it's going to be metabolized, it's going to form a certain level or number of metabolites. And that's all depicted in the diagrams we provided to the board. That's what I was referring to, to those compounds. And on the last point on the claim construction, we're offering or proffering a construction that says free or substantially free of the natural isomer, and the reason being is it's known in the art, and it hasn't been challenged, at least by analysis, that you can never make a compound 100% pure, especially when it comes, I'm sorry, with isomers. It's really, really tough to get them 100%. And that was something that's well recognized in the art, and we have an expert to support that, expert testimony, from a person of learning skill in the art perspective, and that aspect wasn't challenged by analysis. Your Honor, thank you very much for your time this morning. I appreciate it. Thank you. Thank you both. The case is well presented.